First case this morning is Valspar Corporation v. DuPont. Mr. Lockhart. Good morning. James Lockhart appearing for appellants Valspar Corporation and Valspar Sourcing, Inc. I'd like to reserve five minutes of my time for rebuttal if I may. Granted. May it please the court. This appeal presents important issues concerning the proof a plaintiff must present in order to get a price-fixing case under Section 1 of the Sherman Antitrust Act to a jury. The appeal comes to this court in the unique context where two district courts have reached different decisions based on substantially the same record. Valspar submits that if the decision of the court below in Delaware stands, it would mean that a plaintiff can no longer establish a Section 1 price-fixing claim based on circumstantial evidence alone. Mr. Lockhart, it may be substantially the same record, but wasn't the district in Maryland court applying a different standard? I don't believe so. At the end of the day, the court there cited this court's decisions in flat glass throughout its opinion and merely considered the evidence as a whole, and the inference is favorable to the plaintiff and concluded that the inference of conspiracy is reasonable in the face of the competing inference of independent action. But it's saying to the Second Circuit and to language that ambiguous evidence can establish a conspiracy as long as the inferences drawn are reasonable in light of the competing inferences of independent action. Haven't we foreclosed that most recently in Chocolate? I don't think so, because circumstantial evidence is always ambiguous, and this court and the U.S. Supreme Court have made clear that circumstantial evidence alone can be enough to establish a price-fixing claim. And as this court held in Chocolate, the issue remains whether the evidence tends to exclude the possibility that the defendants were acting independently. And consequently, that is essentially the standard that was applied by the court in Maryland. So help us understand then how you get over that standard, and I think it might be helpful to separate out the economic evidence from the non-economic evidence, because while there may be more economic evidence here than in some of our past cases, there is far less non-economic evidence than even in those cases where we concluded that there wasn't sufficient evidence to move forward. Well, certainly. So this case has substantially more evidence than appeared in Chocolate, and it is not just economic evidence. Here, this whole conspiracy began with a call to action by DuPont to get the financial house in order and get prices up for the collective health of the industry. That's followed by the commencement of this global statistics program that DuPont participated in, and at the same time, this unprecedented string of 31 parallel price increases began. Increases or announcements? Well, there were announcements. How many actually resulted? Is it clear from the record how many it was actually? Roughly 80%. I mean, there was some dispute between the experts over that, but our position would be 80%, and that the prices increased by 16% that could not be explained by non-collusive factors. In addition to, and those public price announcements actually acted as communications, and that's all that this court has required in order to show an agreement, even under Chocolate. The issue is whether there's evidence of common action, a common plan, even though there are no meetings or documents that specifically reference an agreement. But parallel pricing alone can't establish that, right? And if that's true for some number of them in saying, well, here's an even greater number than in past cases, how does that get you over the hurdle? That alone doesn't get us over the hurdle, but it substantially distinguishes this case from Chocolate, where Chocolate focused on that change in conduct and said there wasn't one. In fact, in Chocolate, there had been more parallel price announcements in the pre-period, but we also have this information sharing through the global statistics program. Chocolate, you had a finding of a conspiracy in Canada. You don't have anything remotely like that here. No, but that's essentially all that they had was they were trying to extrapolate. That's kind of a big deal, right? Well, they didn't have any evidence. Well, with all due respect, they didn't have any evidence tying that to the United States. And obviously here we're just focused on what was happening in the United States. But they did have a copy of a competitor's announcement of a price increase before that became public. We don't even have that kind of evidence here. And in Baby Food, again, there was that kind of evidence of the existence of the agreement. Still, it wasn't enough to get over the hurdle. So what do we do here in the absence of that kind of non-economic evidence? Okay. Well, for one thing, we believe that the price announcements acted like that sharing of information. They were all announcing to a particular effective date, the same effective date, 31 times. So the press releases themselves acted as that sharing of information. But here we also have internal documents referencing price signaling, training of competitors, discussions about discipline, not undercutting competitors, and not taking share from them. All classic cartel behavior in the same types of documents that were referenced in cases like Petruzzi's and High Fructose, the very cases that the court below tried to distinguish. Let's go back to the press releases because I take your point that signaling, if that's what it is, might be probative evidence of an agreement, communication through that type of conduct. But here we have a finding by the district court, a finding of fact, that there were legitimate purposes for those public announcements. Well, and that's part of our dispute with what the district court did. He was making findings in favor of DuPont and against the non-moving party in the context of a summary judgment motion. Here the evidence is clear that there was not a purpose, as suggested by the district court, for these public announcements. Valspar's contract with DuPont and the other manufacturers, as well as all the other purchasers' contracts, required direct written notice of price increases from the manufacturer to the purchaser. And Valspar received those after these public announcements were made. So that would be a disputed fact and one that was improperly decided by the district court at the summary judgment stage. How do you distinguish between a proper finding of fact as part of a Celotex analysis in summary judgment and a finding of fact that goes beyond the province of the court in the summary judgment context? Well, clearly there was a finding of fact. And I share some of those same concerns with the district court's factual discussion. And I wonder how much of that is proper summary judgment Celotex analysis and how much of that is actually finding of fact, which should be for the jury. Your Honor, I believe the distinction lies in the reason of the courts. Ultimately, what the court is charged with doing is determining whether Valspar's inferences are reasonable. And that's what the Supreme Court said in Kodak in interpreting Matsushita. And the court went beyond that. In fact, I don't think that the court ever said that Valspar's inferences are not reasonable. It said more or less on each occasion, well, that could be conscious parallelism. And so it's a tie. Valspar loses. And I don't think that that can be the standard to be applied because that's why we argue that a... That is our standard, isn't it? What was interesting about your brief to me was you spent a lot of time talking about the first two plus factors. And our jurisprudence, I think, makes clear that in oligopolistic markets, which you would agree this is one. We do. So the emphasis is on the third plus factor, is it not? And you spent precious little time in your brief explaining to us why the third factor means that an error was committed here. I think you only mentioned conscious parallelism and interdependence once each in your brief. And it seems to me the whole ball of wax here revolves around that issue, does it not? Well, that certainly was the focus of the district court. And was that wrong? It was in Maryland, actually. Well, forget it. I mean, Maryland is in a different circuit. Sure. So if conscious parallelism was the focus of the district court, the question, I guess, is was that wrong? And if the district court was right to focus on conscious parallelism because that's what our precedent requires, why have you focused so little on it in your appellate brief? So here's the point. If conscious parallelism is used to respond to every inference, reasonable inference, that may be drawn from the plaintiff's evidence, a circumstantial evidence case will never go to the jury because price fixing happens in oligopolistic markets where conscious parallelism is a possibility. So that's where we take issue with what the district court did is using conscious parallelism, the idea of following, to respond to every piece of evidence. And particularly in this case, it was wrong to do that because the defendants denied they were following. Even if we agree with you that taking the language of Matsushita and Chalker together, that you could get past summary judgment with circumstantial evidence and evidence that does permit another inference. But when we look at that language, it's got to be more than 50 percent, right, because taking account of parallel pricing, taking account of the instruction that we have from Matsushita, if it's equally consistent with just the interdependence of an oligopoly, that can't be enough to move forward. So what gets you beyond the 50 percent of the price announcements, the e-mails, the fact that there were meetings and exchange of information that does not on its face include price information? Why isn't that equally consistent with permissible behavior? Excuse me, let me first take a brief issue with the interpretation of Matsushita, because in prior cases, Flat Glass, Petruzzi's, others, this court has said that that's limited to circumstances involving implausible conspiracies, one to lower prices in Matsushita that might shill pro-competitive conduct. We're not in that situation here. In Matsushita, our interpretation of it has been that the inferences that can be drawn from the evidence may vary, depending on the plausibility of the theory that the plaintiff puts forward. And we believe that the inferences that can be taken from the evidence here are enough, given the extreme number of parallel price announcements, the signaling, the statements about discipline and not taking share together with the economic evidence. I see my time's up. Why should we even take it as signaling when we have that 2009 email that indicates if our competitors, in response to our price increases, go ahead and increase prices, then they will have understood our message. Even that indicates that as late as 2009, there's not an understanding and agreement, and if the conditional language of that makes clear that even at that point in 2009, much less historically, they don't know how competitors are going to respond. Well, that's a reflection of two things, the length of time that this took place, and with changes in personnel and so on, there would be continuing training. But this also occurred right after the recession, the crash in 2008. And so obviously there were price increases happening in 2008 because of what was going on in the economy, and in the 2009, and there was a need to get it going again and again. And this discussion reflects communication, albeit tacit, which is allowed under Plumbly, to achieve a common plan, a common understanding. And that's how they communicate it, and we believe that that's enough, and this case should be decided by a jury. All right, we'll hear you on rebuttal, Mr. Walker. Thank you. Ms. Lalue. Thank you, Your Honor. Sherry Lalue on behalf of EI DuPont Dinamores & Company. To be clear, to get to a jury under this court's well-established jurisprudence, thus far must come forward with evidence that tends to exclude the possibility that DuPont and the other firms acted independently. It really is simply not enough to point to evidence that could be consistent with a conspiracy, but could equally be consistent with unilateral, independent, interdependent conduct. Maybe not equally, but you would agree it doesn't have to absolutely exclude the possibility. That's right, Your Honor, but it has to be, and I believe Judge Krause, you were referring to this earlier in your questions, Mr. Lockhart, as well as Judge Herdiman, this court has required what we call traditional conspiracy evidence for the very reason that in cases like this, in industries like this, normal interdependent conduct can mimic and often be mistaken for collusive conduct. So couldn't collusive conduct be mistaken for interdependent, innocuous price increases? It could. That's what I find so vexing about this area is that how are we, not only as an appellate court, but how are district courts to distinguish tacit agreements, which are illegal, from interdependent, conscious parallelism, price-follow-leader price increases? Is it a fool's errand? Well, I don't think so, although I respect Your Honor's suggestion that it can be difficult at times, but that's precisely why the standard is what it is. It's to guard against those mistaken inferences and subject well-intentioned, law-abiding firms from the burdens and costs and potential liability of a jury trial. This court has drawn those distinctions. So, for instance, in Flat Glass, it applied that very standard. It articulated the standards that we're talking about flowing from Matsushita and required traditional conspiracy evidence, and the evidence there was of a completely different ilk, a completely different nature than what we have at issue here. All we have here is conduct that is not only as consistent with unilateral conduct, but the record, in fact, is chock-full of evidence that is inconsistent with the conspiracy that Valspar posits. Why don't you catalog some of that evidence that shows it's inconsistent? Certainly. Valspar itself, through all of its witnesses and its documents, indisputably, repeatedly, and successfully negotiated a way, not just the price increase announcements, but was successful in playing suppliers off one another to get lower prices, to get better contract terms. That evidence is not limited to Valspar. That is across several other customers in the record. Margins, profit margins, were indisputably declining during this period. For instance, DuPont's profit margin was around 42% in 2001. It plummeted to around 15% in 2008, which, of course, is a ready explanation for the number of price increase announcements in its attempt to get prices up and to stave off that declining profitability, particularly when we consider that those price increase announcements were just that. They did not actually change prices. Well, sometimes they did, didn't they? Certainly. Is Mr. Walker correct? There's a dispute about that as to how many announcements ended up being actual increases? I was just going to address that, Your Honor. I don't believe there is any genuine dispute about that. Dr. Willie, DuPont's expert, did a thorough analysis of the effectiveness of the price increase announcements, which is partly at A9159. And rather, Valspar's experts did not address that analysis. They did not conduct their own analysis of the effectiveness of the price increase announcements. Mr. Lockhart referred to the 16%, which is Dr. McClave's regression model, which is a theoretical model, which is a very different exercise than looking at the transactions prices after an announcement to determine whether prices actually increase. And that's what Dr. Willie did. But the illegality would be the agreement to increase prices regardless of whether ultimately that was successful or not. That is true. A very unsuccessful conspiracy is still illegal. However, we have to evaluate the evidence in the context of all the other evidence and in the context of Valspar's theory. And they are positing a conspiracy that was quite successful. And precisely because we need to be cautious about mistaken inferences, we need to look for that other traditional conspiracy evidence, the bilateral communications between companies. Not at issue here. Judge Krauss, as you noted, in baby food and chocolate, there were some of those communications that even in those cases were not sufficient. We don't even have any of that here. But if announcements constitute communication, if their purpose is signaling, that communication could be enough in the reciprocal conduct to demonstrate an agreement, right, just hypothetically. I'm not sure that's right. The law on so-called signaling is really not very developed. The agencies have a theory. The antitrust agencies have theories along those lines. The case law really hasn't caught up to that. But in any event, what we have here are a few important facts. First of all, it's undisputed that these same kinds of public price increase announcements were used for many, many years before Valspar alleges that there was a conspiracy, including the same kinds of parallelism that you see with one firm announcing and then other firms following suit. There are undisputed legitimate rationale for the announcements. Valspar's own purchasing manager testified as such that he appreciated having the public price increase announcements to know that the attempt was to increase prices at customers other than Valspar as well. And Dr. Williams, Valspar's expert, also testified that there are non-collusive, legitimate rational reasons for a firm to publicly announce increases. Were those inferences in favor of DuPont appropriate for the district court to be drawing at this stage of things? Because we're not talking here just about parallel price increases and about some announcements. That's in tandem with a significant uptick in the number of them and in the rate of them. The average from the 94 to 01 period to the 02 to 2013 period seems like it went, if I'm doing the math correctly, from .38 parallel price increases a year to an average of 2.6. That would be nearly a 700% increase. And it went from 3 out of 13 that were matched by the group to 31 out of 36, and 23% up to 86% that were matched by the whole group. So a significant change in the period before the alleged conspiracy and during the alleged conspiracy. I'm sorry. So the first part of the question, is it appropriate for the district court judge to examine the evidence because he has to in order to apply the standard because a tie actually does go to the defendant. This court has been very clear on that. So he did have to undertake that analysis. With respect to any change in the pre-period and the relevant period, it is not the kind of radical or abrupt change that this court has required, most recently in Chocolate, to constitute evidence to support a conspiracy inference. So any change in frequency is readily explained by what I mentioned before, which is that the suppliers were indisputably facing rapidly increasing costs and declining profit margins. So, of course, in that instance, they are going to announce price increases and try to get prices up, again, particularly because they often were not effective. And the price increase announcements, we should note, again, undisputed, unrebutted analysis from Dr. Willig, occurred at times when costs were rapidly increasing and or demand was increasing or both. So 28 of the announcements occurred, as an example, when costs were increasing. And that analysis is at 9148 of the appendix. So there's no inference to be drawn from any difference between what happened in the pre-period and what happened in the relevant period. Similarly, just the sheer number of announcements doesn't have any legal significance in this context at all. What's the difference between two to three per year and one per year? And how would a rational firm ever know? And that's really the problem with the standard that VALSBAR is proposing here, which is that a court could send a case to a jury based on nothing but lawful interdependent conduct, even if there's a lot of it. If we're looking at a, if you agree that evidence could get you to a jury if it's more than 50 percent, that is, it's permissible of other inferences, but it needs to get over the 50 percent equally consistent standard, then isn't there a difference between a handful of parallel price increases, which are equally consistent with permissible independent pricing, and three dozen of them where they're being matched with a frequency and a number that raises, more likely than not, indicates that it's for purposes of communication and not simply to independently raise prices. No, I don't think that is a fair conclusion. All the economics in case law tells us that this is exactly the kind of follow-the-leader, conscious parallelism that one would expect in this kind of industry. So if it's in a firm's unilateral interest to announce when other competitors announce sometimes, why wouldn't it be all the time? Again, particularly when we think about what these announcements were in that they didn't change list prices, but instead they just opened up a negotiation. So if a firm doesn't announce because we have price protection in contracts, meaning that you can't change the customer's price until you announce, then they have no chance of increasing prices. But if they announce, they can try to increase prices, or if they need to retain volume or see an opportunity to gain volume, they cannot implement the increase and they can even lower prices. In fact, the evidence shows that with respect to Valspar, for 50% of DuPont's announcements after the price protection period expired, that Valspar's prices were either the same or lower than they were before the announcement. Do we really have to guess as to the intention of those announcements when we have these emails? I mean, the 2009 email, for example, gives a pretty wide open window into the significance of the announcement, and that is the competitors receiving and understanding the, quote, clear message, close quote, about price increases. Well, I don't think we have to guess as to the intention because the evidence in the economic evidence, including the plummeting margins, tells us what the intention was. And with respect to emails, there is absolutely nothing lawful, and in fact it's expected for firms to raise their price hoping their competitors are going to do the same. And those emails evidence nothing but that, and in fact show, as Your Honor pointed out, that DuPont and the others really didn't know what their competitors were going to do. All of the emails, when you read them in totality, show normal interdependent conduct of testing the marketplace, seeing what's going to happen. I don't know if Cronus is going to follow. I sure hope they do, and that is entirely legitimate and lawful conduct, so there is no inference to be drawn. And certainly the price increase announcements cannot be said to be so unusual that no firm would have engaged in them absent an agreement, and that is the standard that this Court set out in Baby Food and re-articulated in Chocolate for that kind of conscious parallelism to be supportive of a conspiracy evidence. We just don't have that kind of evidence here. Could you address the role of this industry consultant identified in the record, I think it's Jim Fisher, who was retained by a number of the suppliers? Yes, Your Honor, he was just that. He was an industry consultant, undisputed. DuPont retained him for various projects. Also undisputed that DuPont consulted with him sort of more informally to gather market intelligence. That's the kind of gathering of market intelligence that this Court has repeatedly recognized in Baby Food and other cases. Is it evidence of concerted action? It is not. Among the suppliers? It is not. There's no evidence at all that they agreed to retain the same expert, I mean consultant, and there's certainly no evidence that any advanced pricing plans were communicated to Mr. Fisher, that he communicated any confidential information of one supplier to another supplier at all, and certainly to satisfy the test in Baby Food that that information then affected prices. So it really is a zero-sum game in terms of evaluating the evidence. Certainly retaining expert consultants is at least equally consistent with independent conduct, and there's no evidence here that would qualify that conduct as traditional conspiracy evidence. Your approach seems to be taking each piece of evidence in isolation and explaining why it's equally consistent. But don't we need and don't we expect district courts in analyzing a case presented to them under Section 1 to look at the totality of the evidence that's been presented in summary judgment? And when you have all of this evidence, the economics of 2001 don't seem to be supporting price increases, so a plausible theory, you have the opportunity for exchange of information with the meetings, with a common consultant through whom communications could be sent, the uptick in number and rate of pricing, emails suggesting some understanding about discipline in the industry, not simply independent decision-making, and some emails that are even more explicit than that, and denials that I'm seeing when they're facing plausible in deposition testimony that there was not follow-the-leader pricing, something inconsistent even with the representations of your client as to what occurred here. Why doesn't all of that together get to more likely than not? It doesn't exclude completely the possibility that this was independent, but why isn't that more likely than not enough to get to a jury? So the court has to evaluate each piece of evidence in order to determine whether it's at least equally consistent with independent conduct. But it is true that the court evaluates the evidence in the context of the other evidence. I don't dispute that for a moment. But to answer the question, let's just pause it for a moment. What would happen? You would eviscerate the standard of tends to exclude if you allowed a lot of evidence that's equally consistent with independent conduct as was conspiracy to take a case to a jury. So you would not give firms, again, well-intentioned, completely law-abiding firms, any guidance as to how to conduct their businesses and would, frankly, cause them to act irrationally. Let's just suppose a firm announces a price increase because it feels like it needs to get prices up. Its competitors follow suit. Can it then never announce another price increase because two might be too many? Or can it do two or three but not more than that? Would it have to wait six months, a year, two years? Who knows? Or could it then not join a trade association because then the combination of being a member of a trade association and having some parallel price increases might be enough? Or would it be okay to join the trade association but then you couldn't join a lawful statistics program that is necessary and helpful to running your business to understanding global supply and demand? Because that might be the evidence that would be enough to get to a jury. So it just completely eviscerates the standard and the rationale for the standard, which, again, is to protect against those mistaken inferences and to protect against the chilling effects that those mistaken inferences have. So does that mean circumstantial evidence is never enough? Absolutely not. Is this indirect evidence of the existence of an agreement? Absolutely not. Circumstantial evidence is 100% enough. As we said in our brief, one would expect if this conspiracy lasted as long as it did, one might have some direct evidence, some government investigations, some admissions, some testimony. We have none of that here. But circumstantial evidence, just as we had in flat glass, as there was in high fructose corn syrup, of a different nature, of a completely different nature, is sufficient. We just don't have anything of the ilk that one looks at and says, this really doesn't make sense in the context of interdependence. Well, in those cases, there was direct evidence of an agreement. Pardon me? In those cases, there was direct evidence of an agreement on the non-economic side. And you're saying that you don't need that on one hand. On the other, what else could there be in terms of circumstantial evidence in this case that would make it more likely than not that the conduct was collusive rather than independent? My recollection of flat glass is that there was not direct evidence. There certainly were other defendants who were not at issue at the summary judgment stage who had sought the amnesty program through the Department of Justice and admitted. That's not direct evidence. But they did not. Members of the conspiracy admitted to be members of the conspiracy? It sounds like direct evidence. Well, this court certainly has found that in Chocolate, or in, I'm sorry, different case, certainly there can be a conspiracy among some participants in an industry and not others. And that was PPG's argument in flat glass. And my recollection is that the LOF, I believe it was, as you saw at the amnesty program, did not specifically implicate PPG in their conversations with the Department of Justice. I see my time is up. Thank you, Ms. Lowell. We'll hear from Mr. Lockhart on rebuttal. Thank you, Your Honor. To respond to some of the discussion that just happened, regarding effectiveness of a conspiracy, this court held in flat glass that that isn't relevant to liability. It only might eventually go to an issue of damage. And when counsel says that there were 28 increases when costs were going up, the economic analysis reflects that, takes those into account in finding a 16% overcharge and shows that the cost increases did not justify the price increases. That's a fact issue ultimately for trial. What does that mean when you say the cost increases don't justify? Does that mean that if costs go up 10%, then you can only increase prices 10%? No, it's what the regression analysis that's done in these cases to determine the increase in price, but for the conspiracy, takes into account all market factors, demand, costs, and the like, and shows that even taking all of that into account, there's this unexplained price increase that it's not explained by any non-collusive factors. That's what I mean by that. At the end of the day, the issue in these cases, rather than focusing on is this 50-50 or 51, at the end of the day, what Matsushita means, as explained by the Supreme Court in Kodak, is are the plaintiff's inferences of a conspiracy reasonable? Looking at the totality of the evidence. And that is the fundamental problem with what the district court did here, is that it looked at them piecemeal and didn't give them any probative value as a group looking at all of the evidence. Now it sounds like you're taking issue with our interpretation of Matsushita in Chocolate, because reasonable inferences aren't enough. We said in Chocolate, if it's ambiguous, then you're not going to move forward. If you're taking issue with Chocolate, that's something that we can't address as a panel. That would have to be en banc, right? No, I'm not saying that Chocolate was wrongly decided. Chocolate is distinguishable on its facts, and I think at the end of the day, that's all that Chocolate did was determine that the inferences of the plaintiff were not reasonable. We believe this case is distinguishable when you take the evidence as a whole. Can you address Ms. Rollins' point that perhaps these are the kinds of cases where it's particularly appropriate and more appropriate than in a traditional competitive market to examine individual pieces of evidence, because there needs to be some certainty in the marketplace about what conduct is permissible and what's not, so that as they put it in their brief, I believe zero plus zero plus zero is still zero. Do we need to parse out the evidence and make those determinations about ambiguity piece by piece? Well, this court's cases say no. The court has to look at the totality of the evidence, and ultimately I think what corporations can rely on is the outcome of these cases before a jury, because it is the jury's job to ultimately weigh those inferences as long as they are reasonable and tell us who wins and who loses. But aren't there reasonable inferences that are along a 50% likelihood? This just seems so difficult to analyze as a math problem, because if you have ten pieces of evidence, each of which is 33% likelihood of being true, can you aggregate those and say that's enough? Probably not, but what if you have 40 pieces of evidence that average 46% probability? I mean, it sounds pretty hard not to say that's enough to get past summary judgment, right? Is it even useful to analyze it this way for trial judges to try to quantify the probative value of each piece of evidence? Even recognizing that they do obviously have to look at the record as a whole. I mean, they can't slice and dice you to a point where they're isolating the evidence. I think that's clear. Your Honor, I would agree with you that court cases are not like math equations, and I don't think that courts can effectively mete out justice in that fashion. And that's why at the end of the day, the question is, taken as a whole, are the inferences of a conspiracy reasonable? But isn't there some qualitative analysis required of the salient pieces of evidence? I mean, it's not a math problem, but it's not a potluck stew either, right? But it's not that different than other cases. I mean, courts have to make a judgment about what a reasonable juror can conclude, and that's still what we're talking about here. I don't think it's that different at the end of the day, Your Honor. How does a test of reasonableness account for Matsushita saying that it's not enough for there to be equally likely inferences one way or the other, or our statement in Chocolate about the significance of ambiguous evidence? Well, I think that making a judgment that the inferences are reasonable, if you look at it from a perspective of a math equation, which I'm arguing against, but even if you do, that's enough to get us to a jury. And that's why we believe that the decision below should be reversed and the case remanded for trial. By reasonable, do you mean more likely than not? Right. Well, I don't think it has to be more likely than not to be reasonable. But doesn't our standard require? I mean, if the balance is an equipoise, doesn't our jurisprudence require, I think as Ms. Lalu said, tie goes to the defendant? Well, and the court didn't expressly say that, I don't believe, in Chocolate. And the prior decisions of this court interpreting Matsushita have said that if there's a tie goes to the defendant, it's in situations where of an implausible conspiracy that where the court might be chilling pro-competitive conduct. There's no question here. Conscious parallelism isn't pro-competitive. It just isn't illegal. Thank you. Thank you very much. The court appreciates the excellent briefing. We'll take a matter under advisement.